30257. I'd call the name of the case if I could. So I am waiting to hear someone pronounce Atchafalaya or something like it. Your Honor, this is James Mason Act Counsel for the Corps. I've been practicing this all week and I'm hoping I'll get it right. Atchafalaya. You sound almost like a pronunciation I heard online. Yeah, the emphasis is on the second syllable. All right. Is the appellant ready to proceed? Yes, Your Honor. All right, you may proceed. Thank you, Your Honor. Good morning. As I said, my name is James Mason Act. I'm here today on behalf of the United States Army Corps of Engineers. This is a case about a Corps permit. The permit is going to allow Intervenor Bayou Bridge, who are also here today, to discharge some dredged or fill material into wetlands. It's also going to let Bayou Bridge build its pipeline across Corps easements and federal projects. The Corps took a hard look at the potential impacts of that permit before it approved it. The pipeline's been designed from the start to avoid or minimize impacts to wetlands as much as possible. For example, it's much as possible to avoid impacts to new wetlands. Now the Corps did find that the construction authorized by this permit is going to temporarily affect about 450 acres of wetlands. And to offset that, the Corps required Bayou Bridge to use best management practices to reduce erosion and runoff of sediment from the construction sites into the wetlands. And the Corps also found that this construction is going to permanently convert one type of, about 150 acres of one type of wetlands into another. So they're going to do some cutting and the wetlands are going to grow back as scrub shrub wetlands instead of forested wetlands. Now to comply with the Clean Water Act, the permit requires Bayou Bridge to buy credits from approved mitigation banks. Those credits will ensure that all of these harms to wetlands, the temporary impacts on wetlands, will be offset by the preservation and rebuilding of new wetlands in the same watersheds. Council, we know what your position is. My first question is, since the stay's been lifted, how much digging have you done? My understanding is that no digging has been done yet, Your Honor. Under the terms of the permit, they have to wait till the water drops to a certain level before they can do subterranean work. They can do on-the-ground work. But the plaintiff's all right saying you can't do anything till August. Well, I would defer to Council for Bayou Bridge to give us our best predictions on when the water's going to be low enough. In any event, the company has not invaded construction into wetlands yet.  All right. Now, a big question to me is whether the Corps, in its permit, has met the Oh, you make a good instruction, or the pipeline certainly does, of how it went. Sounds like the agency's been very careful and got the right lamb figures for swamp land with hardwood trees. Very impressive. But the regulations say the Corps has to explain how the impact is sufficient to offset the destruction. And the Corps has only used a very general explanation that you can hide any sort of computation in. That's my question. That is what I think we're here about. Yes, Your Honor. So this is the out-of-kind mitigation question. I'd like to address two points. First, the regulatory background and talk about what the regulations actually require here. I know what they require, but go ahead. Well, with respect, Your Honor, I don't entirely agree with your summary of what the regulations require. Now, I think it's important to acknowledge first that the discretion. And they don't require findings. They don't say the Corps has to find that the wetlands are of similar type or what have you. They just require the Corps to document its decision in the record. And I think there's one other point that's worth making, which is that But can you only go to out-of-kind mitigation credits where in-kind mitigation credits are no longer available? In other words, is the preference for in-kind mitigation credits? Yes. The preference is for in-kind mitigation. There's a preference for in-kind mitigation. There's also a preference for the use of approved mitigation banks, because as the preamble to the compensatory mitigation regulations explains, other methods, having Bayou Bridge go out and try to fix the wetlands, that kind of on-site mitigation has a long track record of failure. So the regulations want you to use approved mitigation bank credits as much as possible because the scientific work is done up front there. We have a mitigation bank. We've already looked at it. We know what it's doing. We know that it's going to provide aquatic functioning to the watershed. And the last point is, Your Honor, that the regulations don't require in-kind credits from the mitigation bank. They don't actually use the phrase in-kind. They just say that the credits from the mitigation bank have to be of a similar type and appropriate. So the language is a little different. And let me tell you now how what the Corps did satisfied those requirements. So there's really three elements to it. The first is the Louisiana Wetlands Rapid Assessment Method, which is this analytic tool that the Corps has built to assess these kinds of projects in Louisiana that scores these projects, that scores the effects on wetlands based on the impacts to aquatic functioning. But they are, and those are separate. They're separate. Well, so when we come to out-of-kind mitigation, what the Corps has to do is it has to show that the out-of-kind mitigation will meet the aquatic resource needs of the watershed. And I think there are three elements in the record that show the Corps did that. The first is that it used the LRAM to ensure that the aquatic functioning that's going to be lost in these acres of cypress swamp are going to be offset by these new acres of bottomland hardwoods. The second element is that the LRAM ensures that these acres of bottomland hardwoods are in the same watershed. And then the last element is this analysis of whether these are similar. And I think that is documented in the record. The record shows that while bottomland hardwood and cypress swamp are not the same, they're not in-kind, they are both palustrine forested wetlands and they play similar roles in the aquatic functioning and ecology of the watershed. And you can find that discussion at 1758 to 1762. So those three together are the elements that show that the Corps appropriately documented its decision to use out-of-kind mitigation bank credits here. And I think what happened in the District Court fundamentally is that the District Court missed the significance of this LRAM tool. And the District Court... Well, don't you think, this is Judge Jones, don't you think that the District Court missed the significance because perhaps the Army Corps didn't explain it very well? Well, I mean, that's, you know, we definitely could have done a better job. I mean, I will say that the parties in the Court were, of course, briefing a wide range of issues, many of which are not, have not made their way up to this schedule. If we had known that the Court was especially interested in out-of-kind mitigation, we, of course, would have briefed it more thoroughly. It wasn't the thrust of the case in the District Court. We did defend it in our briefs in the lower court, but it didn't use the word LRAM and it didn't explain it very well. On the other hand, I think it's fair to say that if this was the focus of the District Court, that the District Court could have asked us for more briefing on this specific issue. It could have just said, I don't understand what you've done here. How do you think you can justify this out-of-kind mitigation of the regulations? And we would, of course, have briefed that. We would have welcomed that opportunity. I read the entire 404 environmental assessment, and what struck me is that it talks about eight different areas where there was going to be an environmental impact that required mitigation, and therefore credits from the mitigation bank and so on. And it seems to me, if that didn't call for further explanation by the District Court, I don't know what would because the appellees have not challenged any of the other assessments about LRAM credits, and one of those in particular in the Terrebonne River Basin involves Bald Cypress Tupelo Swamp and calls for out-of-kind in-basin mitigation. But they didn't object to that, evidently. Do you agree? Yes, Your Honor, I agree. I mean, fundamentally, this is not a case where the District Court grappled with the LRAM or the court's application of it and said, you've got this. This was arbitrary and capricious. You didn't really assess aquatic functioning. This is a case where the District Court just missed it, and as a result, the preliminary injunction is built on findings of fact that are clearly erroneous. Thank you, counsel. Your time has expired. Thank you, Your Honors. Good morning, Judge Graves, and thank you, Judge Graves. And may it please the court, I am Miguel Estrada on behalf of the intervener, Bayou. The District Court applied an outdated injunction standard, but putting that to the side, our standard, the court fundamentally got the administrative law and the record wrong, and even if the court were correct, the State panel was correct in concluding that the limited deficiencies that the District Court noted would not warrant the cater of the permit and, therefore, would not support an injunction in this case. And so even putting aside the questions of the sliding scale, our basic point here is that as Mr. Mason had already started to explain, the court did comply with the regulations. It wrote two extensive EAs, and that the explanations given in the EAs to the objections that have been raised by the appellees are full and, indeed, fulsome in the full sense of the word, and fully comply with administrative law. Let me make just a couple of points on mitigation to add on to those that Mr. Mason made. First, it is absolutely correct that the 2008 regulations that the Federal Register stated established a hierarchy. The court explicitly is directed to choose a mitigation ban if one is available. My second textual point is that I think as was alluded in the argument, if you look at the hierarchy in the mitigation regulations, out-of-kind versus in-kind is relevant to permittee responsible mitigation, B-5 and B-6. B-1, as Mr. Mason, B-2, excuse me, which deals with the banks, does not actually call upon the court to say that you have to go do this for out-of-kind or do this other thing for in-kind. There is a separate, and so A, the regs say you must go to a mitigation bank first if one is available, and B, the question of out-of-kind, of in-kind in the hierarchy becomes relevant not in the mitigation bank at that level, but in B-6 and B-5. There is a separate part of the regs, subsection E, that says that there is a general preference for in-kind, if it is available, over out-of-kind, and when in-kind is not available, the basis should be stated. Now here, what the court said was in-kind is not fully available. We have come up with this other type of out-of-kind, and at page 50 of the 404, they said we think that this is that agencies are not required to explain every dot and tittle of their judgment, because part of why they exist is they have expertise. If this were an FCC case and you had a fight between whether this radio will interfere with the others, it would never occur to anyone that each member of the court has to understand the full background of all the science of the way the FCC concluded this, because the notion of agency expertise is sort of built into administrative law. That's why the arbitrary and capricious standard says that you cannot hold something arbitrary and capricious unless it's completely unexplained or is so wacky that it could not reasonably be ascribed to agency expertise. That's what the standard is, and it seems to me that in the range of everything that the court wrote in this case, that is just not met, and the court was in error in thinking that the EAs were not compliant with NEPA or the Clean Water Act. Having said all of that, it seems to me that the fundamental point still remains that if the court were correct on the deficiencies that it noted, they are deficiencies of explanation. There are things that the court could easily fix, and in fact, most of them are obvious. If they are not obvious from the EAs themselves, are obviously things that could be readily fixed by the court. There are things like the regulations do prefer mitigation banks. They work better than contractors doing mitigation, and in our expert judgment, the aquatic functions of this tree are similar to the functions of this other tree. If the court had said that in high verba, I don't think as a matter of claimant, if the court thought that that was something that was necessary, that would be the end of that claim. Mr. Estrada, what do you think about the O'Reilly case in this connection? Well, I think the government is right that the O'Reilly case is a case that starts with the premise that the court had found that the impacts were going to be significant, and therefore, the only legal way to avoid the EIS, the environmental impact statement, was to provide mitigation that would be significant. Contrary to what the appellees have claimed in this case, the court in this case has never found that the impacts would be significant. To the contrary, the 408 EA expressly said that they would be insignificant and that mitigation would be discussed in the 404 EA, the Clean Water Act EA, solely because the Clean Water Act regs do require that mitigation be used. So it is a case quite unlike O'Reilly in that the whole premise of O'Reilly, as the government points out, was that the court was trying to avoid an EA in a circumstance in which there was going to be a net loss of wetlands, because the wetlands were going to be filled, rather than a transformation of one wetland type to another, and where the mitigation issue actually went to turn an impact from significant into insignificant. Here, the mitigation issue ultimately is relevant only to the Clean Water Act issue, because those are the regs that apply to the 404 EA, but I think the government is right that O'Reilly is not relevant at the get-go for that reason. It is also not relevant for the additional reason that even if you thought that the case did not speak solely to an unmitigated FONSI, it was a pre-2008 case, and there can be no doubt that in 2008 EPA and the court jointly completely changed the environment of how you do mitigation with the new regs, and therefore the level of explanation that is needed now has to be commensurate with what already is explicit and implicit in the regulatory structure that we have now. In this connection, I would like to refer the court to the Sixth Circuit case that we cited in our papers, which is the Kentuckians for the Commonwealth. It was, again, one case where Earthjustice challenged a permit, and there was something like LRAM in that case. It was EXAP. It was what had been developed for Kentucky, and the Sixth Circuit looked at it and said, well, it's the type of expert judgment that we express agencies to make, and we certainly are not going to get into whether this is a good enough measure of the aquatic function being lost, and it concluded by saying, in the end, given the various interrelated factors and possible assessment metrics that could be used in a mitigation plan, the choice of mitigation performance standards requires the exercise of complex scientific judgment and deference to the court's expertise is appropriate. There was the court using EXAP, which was basically the Kentucky version of LRAM, which is why I say that the district court got the ad lib wrong. But again, I go back to my main ally signal point, that even if the district court was correct, that a few sentences of explanation really would have helped its understanding of what the court did. That is not a case for vicator, and therefore is not a case for injunction. Well, interestingly, in O'Reilly itself, the court didn't uphold the injunction. Well, the court upheld a limited injunction after a discussion that expressly embraced the proposition that a remand was appropriate instead of vicator. So far as it appears from the record, Judge Jones, after expressly stating the allied signal principle that I've just stated, the court basically limited the injunction because no one had made any other claim as to how the injunction was inappropriate in light of the fact that only a remand was appropriate. Let me ask you, when this case was before the district court, Mr. Mason, that referred to the fact that there were many issues, which I'm not familiar with. But did the court have before it both environmental assessments? Yes. And this is apparent from the court's opinion, because in discussing the oil spill issue, the court expressly accepted that the district engineer had used the 408 assessment as part of the basis and the prelude for the 404 assessment that had been incorporated by reference into the 404 assessment. And she found that appropriate. Well, the other issue on which I think the district court took criticized the Army Corps assessment was failure to address surrounding conditions or historical conditions or something like that. Oh, yes. This is this question of cumulative impacts. And I think that the court in that event is just mistaken because I will refer you to page 115 of the 408 EA. And there is a fairly extensive discussion of cumulative effects that begins there, including charts of other projects, et cetera. And the net of what the court says is that the plaintiffs are making claims that relate to historical conditions having to do with permits that were issued before the Clean Water Act and before modern regulatory conditions were imposed. And so there are berms. There are piles of dirt. The court accepts that. It says that in the context of the modern world, permit conditions are sufficient not to make the problem worse, and therefore there will be no cumulative effects. If you go to the 404 EA, there is a brief similar, though briefer discussion at page 50. Thank you. Mr. Haslund? Yes. You may proceed. Good morning. May it please the Court. I'm here on behalf of the Commercial Craw Fishing and Conservation Groups in the Uchafla Basin. So I'm going to focus on the key merits issue of the mitigation plan. There's three points I'd like to make. First, the District Court's finding that it violated the Clean Water Act. Second, the District Court's finding that it violated the National Environmental Policy Act, or NEPA. And then last, I'll address this issue of whether there should have been additional explanation in lieu of an injunction. Before I do, Judge Rievele, no one came back to your point about the status of construction in the basin. The company has filed some supplemental evidence. Construction is underway. Clearing of trees is underway as we speak. So time is of the essence in this appeal. So let me turn to the first issue, which is the Clean Water Act requirements. And let me try to put this in context a little bit. The Court authorized the destruction of a significant amount of acreage in the Uchafla Basin and its unique cypress swamps in exchange for this out-of-kind mitigation elsewhere. An out-of-kind mitigation is where you mitigate with a different kind of resource. And in this case, the mitigation was planting trees a considerable distance away in a former agricultural field. But it's still within the Uchafla Basin, is it not? That is correct, Your Honor. It's within the basin. In the watershed. That's right. It is in-basin, but it is out-of-kind. So bottomland hardwoods perform a similar aquatic resource function according to the LRAM and according to various sources cited in the LRAM, right? No. The record is clear that these are very different kinds of places. There is no crawfish in a bottomland hardwood. There's no bird rookeries. Well, there's nothing, however, the EPA and the Fish and Wildlife Service all signed off on this. And maybe they were concerned about crawfish. One of the Louisiana Development Authorities signed off on this. So the crawfish is not part of the precise mandate of the U.S. Army Corps, is it? That's not actually true. The purpose of the Clean Water Act is to protect the beneficial uses of our waters. And the beneficial uses include things like fishing and recreation and things like that. So very much the Clean Water Act is designed to protect specific uses. I guess I would direct the Court's attention, I think this issue really turns on 332.3E1, I think is the key regulation that governs this case. That is a regulation that explicitly prohibits the use of out-of-kind mitigation, except in certain circumstances, and that's what we're going to focus on. Sub 2 of that regulation allows the agency to authorize out-of-kind mitigation, but only under certain conditions. The Corps has to use a watershed approach, which is a very specific and prescriptive process, and that's laid out in 332.3C of the regulations. There needs to be an affirmative finding that this kind of thing would serve the resource needs of the watershed, and all of that needs to be documented in the record. And the District Court found that none of those conditions were satisfied, and the District Court was right, because none of those conditions were satisfied. There was no finding that this out-of-kind mitigation was going to serve the needs of the watershed. There was no reliance on any kind of watershed plan. There was nothing documenting its decision in the record. So your argument is they used the wrong kind of out-of-kind mitigation? You're not arguing that they shouldn't have used any out-of-kind, I guess. I'm arguing that the regulation set a high bar. If you're going to use out-of-kind mitigation, you have to show that it's what the watershed needs. But you agree that out-of-kind is appropriate if in-kind is not practicable, unlikely to compensate for the permitted impacts, or will be incompatible with the proposed process. Under those three circumstances, they can then go to out-of-kind. You agree with that? I'm not exactly sure about that characterization, Your Honor, but they have the flexibility to use out-of-kind, but they have to have a watershed plan that explains that this out-of-kind is going to meet the needs of the watershed in some way that's better than the in-kind. They have that flexibility. And no one argues that that flexibility is a bad thing. I mean, a watershed plan is also defined in the regulations. And all it says here in E, I think it's E2, is that if the district engineer determines using the watershed approach that out-of-kind compensatory mitigation will serve the aquatic resource needs of the watershed, the engineer may authorize out-of-kind compensatory mitigation, the basis for authorization of out-of-kind compensatory mitigation must be documented in the administrative record for the permit action. That's all it says. It doesn't prevent it. It says the basis must. Well, obviously one basis here was that the in-kind compensatory mitigation, with which I believe you do not take issue, the mitigation bank credits were used up, and the alternative, which is bottomland hardwood, was something that was expressly permitted within the contours of the L ramp. Is that not correct? So the rule isn't you get to use out-of-kind whenever you run out of in-kind. That's not the way. That's not the point. All it says is the basis for authorization must be documented. It doesn't say that you have to prefer one over another. That's where I think the district court went astray. But it says there needs to be a finding that this serves the needs of the watershed, and it has to be based on the watershed plan. The L ramp is based on the watershed. You don't disagree with that, right? I do disagree with that. L ramp is not a watershed plan. It's nothing like a watershed plan. You didn't challenge the use of the L ramp in the district court, did you? Or at least she didn't rule on that. Well, there wasn't a lot of discussion about L ramp in the district court, so I think there's a legitimate question about waiver here, but leave that aside. Open up L ramp. It doesn't say what they are telling you that it says. Let me ask you just a general question about it. Of course, they attached a few pages of it to the Army Corps brief, and it looked to me, I mean, some of those pages are about five pages of authoritative citations as to how they developed their L ramp and so on, but as I pointed out to the Army Corps fellow, there are eight different areas where an impact required mitigation. It's about 10 pages in the 404 environmental assessment where they chart each area, and several of those have different, more than one of them have out of kind mitigation. Well, it seems to me legitimate that it's, I mean, maybe there are no crawfish anywhere else, which is who you represent, but maybe the Sierra Club would be interested in the fact that if this L ramp is such an inadequate vehicle for purposes of arbitrary and capricious review, that you should have challenged all of those mitigations, not just the Cypress Tupelo swamp mitigation. Your Honor, I represent the Atchafalaya Basin Keeper and the crawfishermen in the Atchafalaya. The Monsanto versus Geertsen case in the Supreme Court admonished courts to draw injunctions as narrowly as one place. I don't think we're conceding anything about any other place, but I want to come back to L ramp and what it does and doesn't do. It doesn't and it can't override the language of 323-3E, which requires these showings for a mitigation plan. And in fact, if you look at L ramp, it doesn't provide in any respect for out of kind trading of credits. In fact, it explicitly says that its use is for in kind, and that's page nine of the L ramp document. So there's nothing in the L ramp that, for example, would allow for different weighting of credits in a way to allow exchange of in and out of kind. L ramp is not, second, L ramp is not in any respect a watershed plan. That is a legal term of art defined under 332.2. A watershed plan is an integrated approach to managing watersheds, to look at all the problems, all the sources of pollution, and to identify projects and priorities to restoring those. So under these regulations, the Army Corps can look at a mitigation, a watershed plan and say, you know, we think this out of kind and they have that flexibility. But again, the regulations set a very high bar. It's got to be documented in the record. That's not what L ramp is. It's not specific to, and doesn't say a thing about the needs of the Atchafalaya Basin. There's no plan out there that says we need less cypress swamps and more bottom land hardwoods. There's no documentation in the record that says these out of kind credits were the best way to meet the needs of the basin. So let me wrap up this Clean Water Act point. We're taking something fairly simple and making it complicated. You've heard a lot about the hierarchy. The hierarchy doesn't have much to do with this. The issue is whether they've met the standard for out of kind mitigation. The district court got this right. We're here under an abusive discretion standard. There was no documentation for that. So let me turn to the issue of NEPA. And everybody, I think, understands that unlike the Clean Water Act, which puts substantive limits on the issuance of permits, NEPA imposes procedural obligations. And the underlying NEPA question here is whether the Corps complied with NEPA when it found that the impacts of this major piece of crude oil infrastructure in a very sensitive and special place were so insignificant that they didn't need to do a full environmental impact statement. And it is black letter law that an agency has to support its findings of insignificance in the record. Courts will look closely to make sure that NEPA's purposes are being fulfilled. Sort of perfunctory conclusions that mitigation will address every environmental harm, they don't meet the standard of the law. That is true in this circuit and every other circuit. The district court looked at the record, found there was no support for the claim that mitigation would offset the considerable environmental impacts of this project. So the position that the NEPA is on, whether it's called a mitigated FONSI or it's just a regular FONSI, and a FONSI is a finding of no significant impact that relies on mitigation. And that's wrong. There's no separate standard. There's no case anywhere that says these are treated differently. Well, there's no question that they did find that there was no significant impact. That is the basis. And that says that it littered through several times through the 404 EA. They also identify many considerable environmental impacts and they reached the finding of no significant impact by relying on mitigation. So that's why scrutiny of the mitigation is so key to the ultimate finding. Yeah, but all they have to do is articulate, right? But you don't, in other words, we don't have to agree with their balancing of the factors, but all they have to do is articulate the factors. You have to find support in the record for a finding of insignificance. And the district court looked at the record and found there wasn't an IOTA of support for that. The O'Reilly case was a mitigated FONSI. We've given you half a dozen other cases that were not mitigated FONSIs. The analysis is always the same. The courts look at the record to see if there's support. And the record was replete with evidence that there was considerable environmental impacts. This is a major project in an unusually sensitive aquatic area. And there's no conceivable way that the destruction of hundreds of acres of wetlands in a place as big as this is going to be. I mean, that's a little inaccurate. They're going to interfere with some cypress tupelo swamps and there will be scrub swamp afterwards. That wasn't what the record demonstrated, Your Honor. There was considerable record evidence that cutting a 75 foot wide channel 23 miles... Now it's a 30 foot, then a 15 foot through the cypress tupelo swamp ultimately. The channel that they're cutting, destroying century old trees is 75 feet wide. Some of it will be allowed to regenerate. There was considerable record evidence that it would not regenerate. Cypress swamps can't regenerate anymore because of the altered... Now that doesn't go to, that's not relevant to the Army Corps if that was the testimony of your experts concerning the alleged balance of hardships and irreparable harm. I understand that, but we had, there was an expert report in the record that made this point as well. So it was part of the record. It wasn't part of the record pertinent to the EA. Well, in any event, Your Honor, the point that I was trying to get to is that whatever width you characterize it, a channel cut through the basin has very considerable aquatic and environmental effects through the alteration of the hydrologic regime, through dumping of sediment. Let me ask you, are you taking issue with the declaration of no significant impact in the 455 acres that will be temporarily interfered with? Yes, we are. As well as 162. Yes, we are, Your Honor, because what we put in the record during the comment process was that temporary impacts are not temporary. And so the district court had all of that information. It made a finding that the finding of insignificance wasn't supported by the record. We're here under an abusive discretion standard, and there wasn't any abusive discretion. Well, we're here under, I'm not sure what standard we're under when the district court misapplied the law, but anyway, it's still a finding of arbitrary and we have left, which is this remedy question that came up in the motions panel that lifted the injunction. So the district court issued a preliminary injunction under conventional preliminary injunction standards. Again, we're reviewing that under abusive discretion under the law of this circuit. One of the judges on the motions panel said the court should have considered the ultimate remedy at the end of the case, and we're seeing that argument for the first time in this appeal. And as a threshold matter, I want to point out that no party ever made this argument to the district court. Nobody even argued it to the motions panel. It is arising for the first time in this appeal. Well, sometimes courts do surprising things. I will agree with you on that point, Shirley, Your Honor. But under the law of this circuit, that issue has been waived. And in fact, the issue of whether a court should look downstream at the end of the case and apply this allied signal exception that you're hearing about has never been addressed in the context of a preliminary injunction by any court in any jurisdiction ever. And so whatever you think of waiver, it could not possibly have been an abusive discretion for the district court to fail to reach an argument that no one ever made and that no court anywhere has ever brought in at the preliminary injunction stage. Now, it is, of course, true that a preliminary injunction should not exceed the scope of the ultimate remedies that are potentially available in any case. And if it were true that the only possible relief in this NEPA Clean Water Act case would be a remand with no possibility of vacating the underlying permit, then in that case an injunction may have been inappropriate. But that is not even remotely the law that applies here. Vacature of the underlying permit is almost always the remedy in a NEPA Clean Water Act case. A remand without vacature and allowing a project to proceed despite violations of NEPA or Clean Water Act is actually an extremely rare exception. This was a garden variety preliminary injunction under environmental statutes. It's a very common thing. It is narrow. It was well grounded in the facts. The district court applied the conventional four-factor test for preliminary injunctions. The appellants are urging you to apply a whole new framework to a preliminary injunction. The remedy question happens at the conclusion of the case, after there's been a full record, after the court has fully adjudicated the merits, and after the parties have had the opportunity to actually brief and the court considers the remedies. The district court in this case applied the correct standard. It gave everybody an opportunity to be heard. It conducted an evidentiary hearing and it weighed the evidence carefully. It spent two weeks crafting an opinion. We have a 60-page opinion narrowly enjoining 14% of this pipeline. That's the opposite of an abuse of discretion, and we ask that you uphold it. Coming back to where I started, time is of the essence. Let me just ask you, sir, what do you see as the end game here? If we were to uphold the injunction, what happens next in the district court? Sure. The next stage in the district court is that the administrative record is produced. The parties cross-move. Has there been anything done by Judge Dick to set the case on merits? The parties have submitted an agreed schedule for cross-motions of summary judgment. That schedule has been presented to Judge Dick. She has not yet acted on it, but the schedule moves quickly. Plaintiffs agreed that they would move for summary judgment in mid-June. The briefing will be completed by August. This is an administrative law case that will be decided on cross-motions for summary judgment. If both motions are denied, is there any prospect for dealing with a merit trial? No, Your Honor. These cases are always decided on cross-motions for summary judgment based on the administrative record. I'm out of time. The construction is proceeding. The irreparable harm that the court found is happening as we speak. I implore this court, if you are considering upholding the injunction, to lift the stay because by the time that an opinion is issued, it may be too late. One more question. Is there anything in this record that tells us what this compensation, this mitigation, what it looks like? Do we know what it looks like? Do we really know how far it is from where the It's 55 miles away. It's a mitigation bank. 55 miles north of the pipeline right of way. No, it is not Cypress Swamp. It is Bottomland Hardwoods. But it's still within the Atchafalaya Basin, in the watershed. It is in the watershed. There is a component of the project that is restoration of swamp. We are not challenging that. We are challenging the destruction of Cypress Swamp in favor of Bottomland Hardwoods, which are a very different kind of aquatic resource. Thank you, Your Honor. Thank you, Judge Graves. I have three quick points, I hope. Mr. Haselman started his argument with 332.2e with the statement that the regulation, quote, explicitly prohibits out-of-kind mitigation. I would like to refer the court to subsection 1, which actually says in general, in-kind mitigation is preferable. That is not a prohibition. Then he went to subsection 2 of e, where he said that there were findings that were actually required by that, that were not made. What it says is actually that the district engineer determines, using the watershed approach, in accordance with paragraph c, that out-of-kind compensation will serve the aquatic resource needs of the watershed. The district court may use out-of-kind mitigation. Now, the key word here is the district court determines. It seems to me pretty obvious from the EA that the district court so determined, because starting at page 65, he said that this was appropriate compensation, even though it was in part out-of-kind. For the adequacy of that explanation, I would refer the court to one of the chestnuts of administrative law, Overton Park, where the same issue was raised as to whether the agency had made the findings that were called for the statute. The court said, look, if the agency approved the project, we sort of assumed that they necessarily found that. That is sort of implicit, and unless the statute expressly says that formal findings need be made, no more need be said. With respect to LRAM, let me be perfectly clear that Earthjustice never attacked LRAM in the district court. There was a passing line in its motion for an injunction, which accepted that LRAM was the basis for the EAs, but said that it was a disreputable system that had been subject to criticism. In response, at page 28 of our opposition to the injunction motion in the district court, we pointed out how LRAM worked, provided a full site to the public website of the court, and pointed out why, as a matter of administrative law, the LRAM was not properly challengeable, not that it had been challenged. Having said all of that, it is a little bit surprising, therefore, that when the LRAM was the basis expressly discussed in the EA, that the district court could conclude, as the basis for an injunction, that there is quote, not an iota of explanation. If somebody had challenged the LRAM with appropriate arguments, they would have lost, I think, but at least the district court would have engaged what the court actually did. What the district court did here was to ignore the explanation that was actually provided by the court in favor of saying that there was not an iota of explanation when something was expressly actually cited and referred to. If I could do one final point. You may. Final point is to follow up on something that Judge Jones said. This is an APA challenge. As a matter of APA law, the record is limited to the contentions, evidence, and conclusions that were before the agency. On the merits of whether the court was right or wrong, everything stops when the court issued its judgment and everything has been challenged on the basis of what was put in front of the agency before then. Therefore, declarations as to how the basin works, whether the mitigation will work or what the trees are, if they were not put in the administrative record, and here they were not, or whether the cumulative impacts are due to non-enforcement, all of that, if it's not in the administrative record, was properly rejected by the agency. Thank you, counsel. Thank you, Your Honor. The court will take this matter under advisement. We'll call the next case.